IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

ULTRA-MEK, INC.,                      )
                                      )
            Plaintiff and             )
            Counter Defendant,        )
                                      )
      v.                              )      1:18CV281
                                      )
UNITED FURNITURE INDUSTRIES,          )
INC., OISEYS INTERNATIONAL,           )
INC., MAN WAH HOLDINGS LTD.,          )
JIANGSU YULONG SMART                  )
TECHNOLOGY CO., LTD.,                 )
REMACRO MACHINERY                     )
TECHNOLOGY CO., LTD.,                 )
TAIZHOU CHENGUANG VEHICLE CO.,        )
LTD., and MAN WAH (USA), INC.,        )
                                      )
            Defendants and            )
            Counter Claimants.        )


## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

This matter comes before the court on Plaintiff Ultra-Mek,

Inc.'s ("Plaintiff" or "Ultra-Mek") Motion for Summary Judgment,

(Doc. 134). Also before the court is the Motion for Summary

Judgment, (Doc. 142), filed Defendants United Furniture

Industries, Inc. ("UFI"); Oiseys International, Inc. ("Oiseys");

Man Wah Holdings Ltd. ("Man Wah Holdings"); Jiangsu Yulong Smart

Technology Co., Ltd. ("Jiangsu"); Remacro Machinery Technology

Co., Ltd. ("RMT"); Taizhou Chenguang Vehicle Co., Ltd. ("TZ

Vehicle"); and Mah Wah (USA), Inc. ("Man Wah (USA)") (together "Defendants").

## I.   FACTS AND PROCEDURAL HISTORY

### A.   Statement of the Facts

Plaintiff Ultra-Mek, Inc., is the assignee and owner of two patents: both patents describe a reclining chair with reciprocating capability. (First Amended Complaint ("Am. Compl.") (Doc. 31) ¶¶ 22-25.) Both patents were invented by D. Stephen Hoffman and Marcus L. Murphy. (Id. ¶¶ 23-24.) U.S. Patent Number 8,016,348 (the "'348 patent") was filed on July 24, 2009 and issued on September 13, 2011. (See id., Ex. A (Doc. 31-1).) U.S. Patent Number 8,297,693 (the "'693 patent") was filed on September 9, 2011 and issued on October 30, 2012. (See id., Ex. B (Doc. 31-2).) The '693 patent is a continuation of the '348 patent, and the parties agree that the patents are generally identical in nature and scope. (See Defs.' Opening Claim Constr. Br. (Doc. 92) at 13[1]; Pl.'s Corr. Opening Claim Constr. Br. (Doc. 94) at 6.)

According to Plaintiff, Defendants are producing and selling seating units that infringe upon the relevant patents

---

[1] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

without Plaintiff's permission. (Am. Compl. (Doc. 31) ¶ 26.) Plaintiff further alleges that this infringement has continued despite Defendants' knowledge of the patents, while certain Defendants have posted YouTube videos demonstrating how to construct chairs using patented mechanisms. (Id. ¶¶ 28, 31, 34.) Finally, Plaintiff alleges that certain Defendants violated a permanent injunction issued in a prior case in this district by importing and selling recliners covered by that injunction and breached the settlement agreement in that case. (Id. ¶¶ 41-47, 66-67.)

B. **Procedural History**

Defendants answered the Amended Complaint, denied that their products infringe the subject patents, and brought counterclaims against Plaintiff. (See generally Docs. 38, 39.) Plaintiff moved for claim construction of certain disputed terms in the subject patents, (Doc. 91), and the parties submitted a consent motion for a claim construction, or Markman, hearing. (See Doc. 90.) This court held a Markman hearing on August 14, 2019. (See Minute Entry 08/14/2019.) This court issued a Memorandum Opinion and Order construing the disputed terms on September 26, 2019. (Doc. 124.) Plaintiff filed a Motion for Summary Judgment on April 9, 2020. (Doc. 134.) Defendants filed their own Motion for Summary Judgment on the same day. (Doc.

- 3 -

142.) Motions to Seal have also been filed by Plaintiff, (Docs. 137, 156, 164), and Defendants, (Docs. 145, 168) due to the inclusion of financial and business information in the parties' briefs. The court granted the motions to seal on March 22, 2021, (Doc. 173).

## II.  LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). A factual dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289–90 (1968) (stating that a dispute is not genuine for summary judgment purposes when one party rests solely on allegations in the pleadings and does not produce any evidence to refute alternative arguments). This court's summary judgment inquiry is whether the evidence "is so one-sided that one party must prevail as a matter of law." Liberty Lobby, 477 U.S. at 252. The moving party bears the initial burden of demonstrating "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325. If the "moving party

- 4 -

discharges its burden . . . , the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." McLean v. Patten Cmtys., Inc., 332 F.3d 714, 718-19 (4th Cir. 2003) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)). Summary judgment should be granted "unless a reasonable jury could return a verdict in favor of the nonmovant on the evidence presented." McLean, 332 F.3d at 719 (citing Liberty Lobby, 477 U.S. at 247–48).

In addition, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." Liberty Lobby, 477 U.S. at 247-48. "[T]he non-moving party must do more than present a scintilla of evidence in its favor." Sylvia Dev. Corp. v. Calvert Cnty., 48 F.3d 810, 818 (4th Cir. 1995). Ultimately, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Liberty Lobby, 477 U.S. at 249.

When facing cross-motions for summary judgement, this court reviews "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (citations and internal quotation marks omitted). "When

considering each individual motion, the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." Id. (citation and internal quotation marks omitted).

## III. **ANALYSIS**

### A. **Claim Preclusion**

Plaintiff moves for summary judgment on (1) UFI's Third and Fourth Counterclaims of Invalidity and First through Sixth Affirmative Defenses; (2) Oiseys' Third and Fourth Counterclaims of Invalidity and First through Sixth Affirmative Defenses; and (3) TZ Vehicle, Man Wah (USA), Man Wah Holdings, RMT, and Jiangsu's Third and Fourth Counterclaims of Invalidity and First and Second Affirmative Defenses. (Doc. 134 at 1-2 n.1.) Plaintiff's motion for summary judgment centers around whether claim preclusion applies in this case. A prior action involving the same patents, Ultra-Mek, Inc. v. Man Wah (USA), Inc., No. 1:16-cv-00041-NCT-JLW (M.D.N.C. Jan. 15, 2016) (hereinafter "Man Wah I"), yielded a settlement agreement, a stipulation of dismissal, and Permanent Injunction, (Doc. 54-1), prohibiting certain Man Wah parties from producing any "seating units and mechanisms that perform substantially the same function in substantially the same way to yield substantially the same

- 6 -

result." (Pl.'s Br. in Supp. of Summ. J. ("Pl.'s Br.") (Doc. 135) at 7.) Plaintiff alleges that Defendants in this case are all subject to claim preclusion regarding invalidity and these affirmative defenses.

### 1. **Waiver of Claim Preclusion**

Before assessing the merits of Plaintiff's argument for claim preclusion, this court will first address Defendants' contention that Plaintiff has waived any claim preclusion defense. (Defs.' Opp'n to Pl.'s Mot. for Summ. J. ("Defs.' Resp.") (Doc. 152) at 11-12.) Defendants argue that under Fed. R. Civ. P. 8(c), claim preclusion has not been timely pleaded and therefore has been waived and cannot be argued at this stage. (Id. at 11.) Defendants contend that Plaintiff could have raised the argument "in its answers to any of Defendants' counterclaims of invalidity", or "in any of its interrogatory responses," rather than waiting until the summary judgment stage. (Id.)

The Fourth Circuit has not laid out a precise rule for when a preclusion defense must be raised, however, a party must at minimum "raise its preclusion defenses 'at the first reasonable opportunity.'" Ga. Pac. Consumer Prods., LP v. Von Drehle Corp., 710 F.3d 527, 533–34 (4th Cir. 2013) (quoting Aetna Cas. & Sur. Co. v. Gen. Dynamics Corp., 968 F.2d 707, 711 (8th Cir. 1992)).

- 7 -

Though few courts have more specifically interpreted <u>Georgia</u> <u>Pacific</u>'s "first reasonable opportunity," at least one court in this Circuit has interpreted this language as asking whether the party making a preclusion argument acted "in good faith and with due diligence" to determine if preclusion was raised "within a reasonable period." <u>HSBC Bank USA, Nat'l Ass'n v. Resh</u>, Civil Action No. 3:12-cv-00668, 2013 WL 6230670, at *5 (S.D. W. Va. Dec. 2, 2013).

This court agrees with Plaintiff that the full account of the facts and scope of this case, and therefore the full argument that this claim has already been adjudicated, came to light "only after" this court's Markman Order. (Pl.'s Br. in Reply to Defs.' Opp'n to Pl.'s Mot. for Summ. J. ("Pl.'s Reply") (Doc. 162) at 5.) Moreover, in <u>Georgia Pacific</u>, the claim preclusion argument at issue was first brought not only after the judgment was entered, but after appeal. 710 F.3d at 528. Those facts are hardly comparable to the present case, in which Plaintiff raised its claim preclusion argument in April 2020, (Doc. 134), in its first substantive filing after the Markman Order was issued on September 26, 2019, (Doc. 124). No evidence of bad faith on the part of Plaintiff has been presented, and the argument was raised within a reasonable time after this court's Markman Order.

- 8 -

Separately, regardless of timeliness, Plaintiff maintains that its claim preclusion argument responds to Defendants' invalidity counterclaim, which is itself a defense, 35 U.S.C. § 282 (1994), thereby making the claim preclusion argument "a defense to a defense." (Pl.'s Reply (Doc. 162) at 5.) This, Plaintiff contends, means "waiver is not appropriate." (Id.) Though Plaintiff provides no authority protecting "a defense to a defense" from waiver, this court finds that Plaintiff has raised the issue within a reasonable period and has therefore not waived its claim preclusion argument regardless.

### 2. Legal Standard for Claim Preclusion

Claim preclusion ensures "that a right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction cannot be disputed in a subsequent suit between the same parties." Aliff v. Joy Mfg. Co., 914 F.2d 39, 42 (4th Cir. 1990) (alteration in original) (quoting S. Pac. R.R. v. United States, 168 U.S. 1, 48–49 (1897)). In order to determine whether claim preclusion requires a finding of infringement, this court must assess several factors. Three elements are needed to bar a claim on res judicata grounds: "(1) a judgment on the merits in a prior suit resolving (2) claims by the same parties or their privies, and (3) a subsequent suit based on the same cause of action." Id.; see also Montana v.

- 9 -

United States, 440 U.S. 147, 153 (1979) ("Under res judicata, a final judgment on the merits bars further claims by parties or their privies based on the same cause of action.").

### a. Judgment on the Merits in Prior Action

The first factor for the court's consideration is whether the prior action resulted in a final judgment. The Settlement Agreement in Man Wah I resulted in a dismissal with prejudice. (Pl.'s Br. (Doc. 135 at 7.) Plaintiff contends, and Defendants do not dispute, that "a stipulation of dismissal with prejudice is a final judgment on the merits." (Id. at 23). See also Ford-Clifton v. Dep't of Veterans Affairs, 661 F.3d 655, 660 (Fed. Cir. 2011) ("It is widely agreed that an earlier dismissal based on a settlement agreement constitutes a final judgment on the merits in a res judicata analysis.").

### b. Privity of Parties

Claim preclusion also requires that the same parties be involved in the action, or else parties in privity with those in the original case. Gross v. Weingarten, 217 F.3d 208, 217 (4th Cir. 2000) ("It is an axiom of collateral estoppel . . . that the defendants can be bound . . . only if they were parties, or in privity to a party."); Comite de Apoyo a los Trabajadores Agricolas (CATA) v. U.S. Dep't of Labor, 995 F.2d 510, 514 (4th Cir. 1993) ("Nor is Fairview in privity with DOL, such that it

- 10 -

would be bound by our judgment as a non-party."). In this pair of cases, the parties partially differ. Man Wah I bound the defendants "and [their] members, agents, representatives, employees, successors, and assigns, and all others in active concert or participation with them." (Doc. 54-1 at 4.) Man Wah Holdings, and RMT were all involved in the previous case. There is no further need to demonstrate privity for those defendants in analyzing claim preclusion.

Plaintiff argues that the Defendants new to this action are in privity with the parties present in the previous case. Privity between parties can be established if the new party is "so identified in interest with a party [from the previous] litigation that he represents precisely the same legal right in respect to the subject matter involved." Jones v. SEC, 115 F.3d 1173, 1180 (4th Cir. 1997) (internal quotation marks omitted). "The concept of privity requires an alignment of interests and not an exact identity of parties," and thus the privity inquiry "centers on the closeness of the relationship in question." Weinberger v. Tucker, 510 F.3d 486, 492 (4th Cir. 2007). This court will assess the relevant Defendants separately to determine whether they are in privity with the defendants in Man Wah I. The new Defendants in this case include Jiangsu, TZ Vehicle, UFI, and Oiseys.

- 11 -

### i.  **Jiangsu**

First, Plaintiff argues that Jiangsu is in privity with parties from Man Wah I. Jiangsu is "under control of the same management team" as both RMT and Man Wah Holdings. (Pl.'s Br. (Doc. 135) at 8-9.) Plaintiff alleges that Jiangsu "is 80% owned by RMT and 20% owned by Cheggung Yuan." (Id. at 16.) RMT, in turn, which itself was named in the Settlement Agreement of Man Wah I, is "93% owned by Man Wah Industrial Co., Ltd. under Man Wah Holdings Ltd." (Id.) Plaintiff highlights that the corporate board of Jiangsu includes the Chairman of Man Wah Holdings, a second Man Wah Holdings director, and the general manager of RMT. (Pl.'s Reply (Doc. 162) at 15-16.) The relationship between Jiangsu and RMT/Man Wah Holdings is clearly incredibly close, if not entirely that of full formal ownership. The parties' interests with respect to this action appear to overlap almost entirely – if not completely. Jiangsu appears to be in privity for purposes of this case with Man Wah Holdings and RMT, both parties to the previous action.

### ii.  **TZ Vehicle**

TZ Vehicle is somewhat more removed from the Man Wah Holdings organization than Jiangsu. However, TZ Vehicle is nevertheless owned by the same family that owns and directs Jiangsu and Oiseys. (Id. at 17.) In Universal Furniture, this

- 12 -

court found that an individual defendant was in privity with a prior corporate defendant because he was "the Vice President, Chief Operating Officer, Secretary, Treasurer, and part owner" of the prior corporate defendant. Universal Furniture Int'l, Inc. v. Frankel, 835 F. Supp. 2d 35, 41 (M.D.N.C. 2011), aff'd, 538 F. App'x 267 (4th Cir. 2013). While Defendants "do not concede" that TZ Vehicle is in privity with the parties in Man Wah I, (Defs.' Resp. (Doc. 152) at 27 n.8), they offer no facts to counter Plaintiff's explanation that TZ Vehicle is closely identified with the Man Wah I settlement parties due to "significant overlapping ownership and familial control," (Pl.'s Br. (Doc. 135) at 16), as well as shared counsel and demonstrated common business interests, (id. at 17). Plaintiff moved, in part, for summary judgment on the Third and Fourth Counterclaims of Invalidity and the First and Second Affirmative Defense of TZ Vehicle, Man Wah (USA), Man Wah Holdings, RMT, and Jiangsu. (Pl.'s Br. (Doc. 135) at 1-2 n.1.) All of these parties were either in the prior action or are in privity to those parties from the prior action. Thus, the claim preclusion analysis with regard to these segments of the Motion for Summary Judgment may proceed to the next prong. However, the analysis cannot end there for Plaintiff's other summary judgment requests. Defendants' brief focuses on UFI and Oiseys,

- 13 -

contending that those two entities in particular are not in privity with the Man Wah I parties.

### iii. **UFI**

Both UFI and Oiseys are "separate entities that sold products well before Man Wah I and were not involved in that litigation." (Defs.' Resp. (Doc. 152) at 27.) UFI "has no relationship with Man Wah or its subsidiaries aside from buying components to integrate into its products," and was "not a party to the previous litigation or settlement agreement." (Id.)

Plaintiff, on the other hand, argue that UFI is in privity with the Man Wah I parties. UFI purchased the seating units at issue from TZ Vehicle and Jiangsu, in what Plaintiff describes as "a closely linked supply chain." (Pl's Br. (Doc. 135) at 20.) The primary basis of Plaintiff's argument is the existence of an indemnification agreement between UFI and Jiangsu in the present action. Id. at 21. No additional facts demonstrate when the indemnification agreement was reached or what role Man Wah I may have played in the signing of such a contract. Defendants allege the indemnification agreement is a "boilerplate dealing[]" that serves as a "standard supplier-buyer arrangement." (Defs.' Resp. (Doc. 152) at 30.)

Plaintiff contends that indemnification in this instance "supports a finding of privity in the context of claim

- 14 -

preclusion or collateral estoppel." (Pl.'s Br. (Doc. 135) at
21.) Plaintiff relies heavily on a case from the Northern
District of California, in which a court found that "[b]ecause
[the prior litigant] is contractually obligated to indemnify
defendants for any losses stemming from a finding of
infringement, the court finds that the parties are in privity."
SpeedTrack, Inc. v. Office Depot, Inc., No. C 07-3602 PJH, 2014
WL 1813292, at *6 (N.D. Cal. May 6, 2014). However,
"[w]hile indemnification is some evidence of privity,
indemnification alone does not mandate a finding of privity."
Earth Res. Corp. v. United States, 44 Fed. Cl. 274, 286 (1999).
See also H&S Tool, Inc. v. Austerman, No. C-3-07-331, 2008 WL
420036, at *4 (S.D. Ohio Feb. 14, 2008). A more holistic
analysis of control is necessary, as "preclusion is appropriate
only if the putative agent's conduct . . . is subject to the
control of the party who is bound by the prior adjudication."
Taylor v. Sturgell, 553 U.S. 880, 906 (2008). The Fourth Circuit
has made clear that the test for privity "centers on the
closeness of the relationship in question." Weinberger, 510 F.3d
at 492. Indemnification does not automatically guarantee such
closeness. Moreover, the agreement is between UFI and Jiangsu –
Jiangsu was not itself a party to Man Wah I, though it is in
privity with the Man Wah I parties for purposes of this action.

- 15 -

Plaintiff argues the "interconnectedness" of Jiangsu and the other defendants is "a coordinated effort by Man Wah," (Pl.'s Reply (Doc. 162) at 15), automatically making UFI closely linked with all of the Man Wah organization due solely to the indemnification agreement. However, Plaintiff provides few other facts to support this theory of UFI's closeness.

The only other fact connecting UFI to the Man Wah organization is the shared legal counsel of UFI and the Man Wah organization. However, privity "requires more than a showing of parallel interest or use of the same attorney." H&S Tool, 2008 WL 420036, at *4. See also Wills v. Arizon Structures Worldwide, L.L.C., 824 F.3d 541, 546 (5th Cir. 2016) (finding no privity in spite of shared counsel); Waddell & Reed Fin., Inc. v. Torchmark Corp., 243 F. Supp. 2d 1232, 1255 (D. Kan. 2003) (no privity found even though the entities "share common counsel" and shared common ownership); Hartford Accident & Indem. v. Columbia Cas. Co., 98 F. Supp. 2d 251, 257 (D. Conn. 2000) ("[W]hile the fact that [the parties] have been represented by . . . the same counsel is considered in the privity analysis, . . . Hartford has not carried its burden of demonstrating that Columbia is in privity with Continental."). Indemnification and shared counsel are substantial considerations in privity analysis, but these two factors alone have been presented to the

- 16 -

court as evidence of closeness. On the other hand, Defendants point out that UFI is a separate entity that sold products "well before Man Wah I", and "has no relationship with Man Wah or its subsidiaries aside from buying components to integrate into its products." (Defs.' Resp. (Doc. 152) at 27.) No reasonable jury could find that the high bar for finding privity between UFI and the Man Wah I parties has been met at this stage in the proceedings.

### iv. Oiseys

Plaintiff also argues that Oiseys is in privity with the settlement parties from Man Wah I. The owner of Oiseys, Plaintiff notes, is a director of Jiangsu, and the son of the owner of Jiangsu. Due to this overlapping familial ownership, Plaintiff contends Oiseys is in privity with Jiangsu. Plaintiff further claims that since Jiangsu is in privity with the parties from Man Wah I, Oiseys is in privity with those parties as well.

This court agrees that Jiangsu is in privity with the parties from Man Wah I. See discussion infra III.A.2.b.i. However, the weak link lies in Plaintiff's attempt to link Oiseys to Jiangsu. The primary overlap between the companies is that Steven Yuan, the owner of Oiseys, is the son of Jiangsu's owner and serves as a director on Jiangsu's board. (Pl.'s Br. (Doc. 135) at 17.) Additionally, the CEO of Man Wah (USA)

"attended a mediation" on behalf of Oiseys, Jiangsu, and the
other involved companies - other than UFI. (Id. at 18.)

A parent company and its subsidiary are in privity for
purposes of claim preclusion. Whitehead v. Viacom, 233 F. Supp.
2d 715, 721 (D. Md. 2002). However, Oiseys is not formally a
subsidiary of the Man Wah organization. On one hand, the use of
a common attorney does indicate that Oiseys has shared interests
with Jiangsu and the other Man Wah entities. However, while
Plaintiff has demonstrated that Oiseys is extensively linked
with the rest of the Man Wah organization, little evidence is
provided demonstrating the level of closeness of relationship
necessary for privity. Plaintiff relies on another case in which
this court found privity for purposes of collateral estoppel
under different circumstances.

> [B]ased on the nature of Defendant's participation in
> the [prior litigation] and his role as an executive
> officer and part owner of [the prior defendant
> corporation], this court finds that Defendant's
> interests were aligned with those of [the prior
> defendant corporation] such that the defense . . .
> that was mounted also constituted representation of
> Defendant's legal right to contest . . . liability.

Universal Furniture, 835 F. Supp. 2d at 42. In Universal
Furniture, the relevant defendant had actively participated in
the prior litigation. Id. Oiseys itself played no role in Man
Wah I. Moreover, Oiseys has no ownership stake in any of the

- 18 -

companies involved in the Man Wah I settlement. Rather, the closest allegation is that the individual owner of Oiseys is a director – with no alleged ownership stake – of Jiangsu. Jiangsu, while almost entirely owned by Man Wah I parties, and now involved in the sale of furniture, was not involved directly in Man Wah I either. The link between Oiseys and the Man Wah I parties is too attenuated to find privity for the purposes of claim preclusion.

### c. Same Cause of Action

Finally, where privity exists, whether two causes of action are identical for claim preclusion purposes depends on "whether the claim presented in the new litigation arises out of the same transaction or series of transactions as the claim resolved by the prior judgment." Laurel Sand & Gravel, Inc. v. Wilson, 519 F.3d 156, 162 (4th Cir. 2008) (internal quotation marks omitted). In patent cases, "claim preclusion does not apply unless the accused device in the action before the court is 'essentially the same' as the accused device in a prior action between the parties that was resolved by a judgment on the merits." Acumed LLC v. Stryker Corp., 525 F.3d 1319, 1324 (Fed. Cir. 2008).

The central question determining the application of claim preclusion where privity exists centers around whether the

- 19 -

devices in Man Wah I are 'essentially the same' as the devices in the present action. "While the court looks to Fourth Circuit law as to general principles of claim preclusion . . . , whether two patent infringement claims are identical is an issue specific to patent law and, thus, must be governed by legal principles established by the Federal Circuit." SV Int'l, Inc. v. Fu Jian Quanyu Indus. Co., 820 F. Supp. 2d 677, 683–84 (M.D.N.C. 2011). Devices are considered essentially the same "where the differences between them are merely 'colorable' or 'unrelated to the limitations in the claim of the patent.'" Acumed, 525 F.3d at 1324.

Plaintiff argues that the accused products in the two cases are essentially the same, noting that "both cases involve seating units that are the same, or at most, colorable imitations of each other." (Pl.'s Br. (Doc. 135) at 23.) Plaintiff paints the products with a broad brush, noting that both cases deal with "seating units capable of reclining between three positions: an upright position, an intermediate 'TV' position, and a fully reclined position." (Id. at 23-24.) Furthermore, Plaintiff argues, the accused products in both cases "have the same components: a seat, a backrest, a base unit, and an extendable ottoman." (Id. at 24.) The similarities also extend to the use of "reclining mechanisms that include[] a

- 20 -

linear actuator to provide the force required for the seating unit to recline between the three aforementioned positions." (Id. at 26.) Plaintiff's expert backs up this analysis, submitting that "[i]n comparing the functions of the Asserted Patents or the 4152 unit to that of the RMT mechanism, the units perform substantially the same function in substantially the same way to achieve substantially the same result." (Technical Report, Author: Rufus R. Brown, II ("Brown Report") (Doc. 136-10) at 44.)

Defendants, on the other hand, argue that "there are material differences between [the RMT mechanism at issue in Man Wah I] and the mechanisms accused here." (Defs.' Resp. (Doc. 152) at 13.) Defendants highlight two specific differences between the designs: first, the differing movement and positioning of the ottoman in the "TV position," (id. at 15), and second, differing linkage components in the two chairs, (id. at 19-20). Though Plaintiff's expert counts the mechanisms' similarities, (Brown Report (Doc. 136-10), Defendants present the expert report of Dr. Kimberly Cameron in contrast, (Expert Report of Dr. Kimberly Cameron ("Cameron Report"), (Doc. 152-5). Dr. Cameron highlights a multitude of allegedly material differences between the products in this case and the RMT mechanism at issue in the Man Wah I products. She ultimately

concludes that "the RMT Mechanism is substantially different from the 4152 mechanism." (Cameron Report (Doc. 152-5) ¶ 177.)

Where there is substantive dispute, the question of whether accused products are "essentially the same" is a question of fact typically left to the factfinder, rather than determined as a matter of law. See Foster v. Hallco Mfg. Co., 947 F.2d 469, 480 (Fed. Cir. 1991) (at summary judgment, court found "it inappropriate to rule on the evidence of 'material differences' in the first instance and [instead] leave it to the trial court to determine whether this suit is based on a different claim"); Certusview Techs., LLC v. Usic, LLC, Case No. 2:14cv373, 2014 WL 12591937, at *9 (E.D. Va. Dec. 15, 2014) (denying motion to dismiss, where "the parties dispute whether the products at issue in this case are essentially the same as those involved in the [prior] action", deeming it a "factual dispute"). At this stage, this court could only grant summary judgment if no reasonable jury could find that the products are colorably different. This court does not believe Plaintiff's arguments have met that standard.

Defendants have alleged ample differences between the products to create a genuine issue of material fact for a jury. Thus, even though some Defendants are in privity with the Man

- 22 -

<u>Wah I</u> parties, this court will deny Plaintiff's Motion for Summary Judgment.

### B. <u>Infringement Claim</u>

Defendants' motion for summary judgment first seeks judgment on questions of infringement, asking the court to find that "Defendants have not infringed any of claims 7-11, 13, and 14 of the asserted '348 patent and claims 1, 2, and 4-9 of the asserted '693 patent." (Doc. 142.) A plaintiff may prove direct infringement by proving either literal infringement or infringement under the doctrine of equivalents. <u>Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.</u>, 424 F.3d 1293, 1310 (Fed. Cir. 2005).

Under the doctrine of equivalents, "a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." <u>Warner-Jenkinson Co. v. Hilton Davis Chem. Co.</u>, 520 U.S. 17, 21 (1997). The Supreme Court has held that the doctrine of equivalents must be applied in a precise manner, holding that "[e]ach element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements

- 23 -

of the claim, not to the invention as a whole." Id. at 29. The court therefore "must consider each element of the allegedly infringed claim to determine whether there is equivalence between each of those elements and the accused device or method." N5 Techs. LLC v. Capital One N.A., 56 F. Supp. 3d 755, 760 (E.D. Va. 2014). "If there is not equivalence between the accused device or method and any one element of the patent claim in issue, then there is no infringement under the doctrine of equivalence." Id. at 760–61.

Defendants argue that the accused products do not meet the opposed-ends limitation, even under the doctrine of equivalents, written in the '348 patent as follows:

> [w]herein the power actuating unit includes opposed first and second ends, and wherein the first end of the power actuating unit moves forwardly as the seating unit moves from the upright position to the TV position, and wherein the second end of the power actuating unit moves rearwardly when the seating unit moves from the TV position to the fully reclined position.

('348 Patent (Doc. 101-1) col. 7 lines 9–15.) Defendants argue that the accused products do not possess an actuating unit with "opposed first and second ends," and even if they do, those opposed ends do not move as specified in the patent. (Defs.' Br. (Doc. 143) at 14.) The actuating unit used on the accused products is instead a "carriage-style" actuator, which

- 24 -

Defendants allege is completely different from the actuating unit envisioned by the patent. (Id.)

"To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly." Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1575 (Fed. Cir. 1995). This does not apply here: the carriage-style actuator does not have literal opposed ends in the format envisioned by the patent. However, Plaintiff primarily relies on an infringement theory based on the doctrine of equivalents. Differences in structure that prevent a finding of literal infringement do not prevent a finding of infringement under the doctrine of equivalents. See Remington Arms Co. v. Modern Muzzleloading, Inc., No. 2:97CV00660, 1999 WL 281341, at *6 (M.D.N.C. Feb. 9, 1999) ("[D]ifferences in structure between Plaintiff's 700 ML and Defendant's DISC Rifle does not impede a finding of infringement under the doctrine of equivalents."). The doctrine of equivalents instead requires that, with regard to each element of the patent claim, "two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same." Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605, 608 (1950). This is what Defendants correctly call the "function-way-result test." (Defs.' Br. (Doc. 143) at 16.) Defendants argue that the

- 25 -

existence of only one carriage-style actuator excludes the possibility of any infringement, since the carriage-style actuator is "substantially different, both in design and in the way [it] move[s] a load, from the actuating units required by the Claims-at-Issue." (Id. at 20.) Indeed, even "[w]here an accused device performs substantially the same function to achieve substantially the same result but in a substantially different manner, there is no infringement under the doctrine of equivalents." Dolly, Inc. v. Spalding & Evenflo Cos., 16 F.3d 394, 400 (Fed. Cir. 1994).

However, Plaintiff presents evidence supporting its contention that the mechanism does, in fact, perform substantially the same function in substantially the same way to achieve substantially the same result. Plaintiff's expert identifies two distinct endpoints on the actuator to meet the opposed ends requirement. (Brown Report (Doc. 136-10) at 13.) He describes the "second end" of the actuator moving "rearwardly, in substantially the same way." (Expert Report of Rufus Brown Responding to Expert Report of Dr. Kimberly Cameron Concerning Infringement (Doc. 136-19) ¶ 42.) As Plaintiff notes, by contending this argument is an attempt at further claim construction, the claim as defined does not require further specificity as to what constitutes an opposed end – the

- 26 -

"positional limitation" Defendants "attempt to impose" is not inherent in the patent or discussed in this court's Markman Order. (Pl.'s Br. in Opp'n to Defs. Mots. for Summ. J. ("Pl.'s' Resp.") (Doc. 154) at 14.) Moreover, Plaintiff identifies the carriage – identified by Plaintiff's expert as the second end - moving "rearwardly," as required by the patent. Plaintiff argues that "the first end of the actuating unit moves forward when the seating unit moves from the upright to the TV position," while "the second end of the actuating unit moves rearwardly" when the chair adjusts "[f]rom the TV position to the fully reclined position." (Id. at 18.) Plaintiff's characterization is in line with the patent's claims and construction.

While the claim construction phase of an infringement claim is a matter of law for the court, "[w]hether a claim encompasses an accused device, either literally or under the doctrine of equivalents, is a question of fact." Zelinski v. Brunswick Corp., 185 F.3d 1311, 1315 (Fed. Cir. 1999). This means that in the summary judgment context, "[w]hether a claim is infringed under the doctrine of equivalents may be decided on summary judgment if no reasonable jury could determine that the limitation and the element at issue are equivalent." Id. at 1317. Here, Plaintiff and Defendants present opposing characterizations of the mechanism – it is not this court's role

- 27 -

to weigh the credibility of each factual contention regarding the accused products. A reasonable jury could feasibly find equivalence based on the evidence presented, and this court will therefore deny the motion for summary judgment on the issue of infringement.

C.    **Limitation of Damages**

Defendants request that the court limit the damages available against them on multiple bases, ranging from critiques of Plaintiff's expert to denials of proper notice.

1.    **Reliability of Plaintiff's Damages Witness**

Defendants' first argument critiques the testimony of Plaintiff's expert, Mr. Graham D. Rogers, and his methodology in calculating damages. (Defs.' Reply in Supp. of Mots. for Summ. J. ("Defs.' Reply") (Doc. 167) at 16.) Rule 702 provides that testimony by an expert witness must be "based on sufficient facts or data" and be "the product of reliable principles and methods." Fed. R. Evid. 702(a)-(d); see also Bresler v. Wilmington Tr. Co., 855 F.3d 178, 195 (4th Cir. 2017). A challenge to a witness' reliability under Rule 702 is governed by Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993). Daubert analysis, typically raised in a motion to exclude expert testimony rather than a motion for summary judgment, requires two analytical determinations. First, "whether an expert's

- 28 -

testimony reflects 'scientific knowledge,' [and is] "'derived by the scientific method,'" and second, "whether the expert's testimony is 'relevant.'" <u>Doe v. Ortho-Clinical Diagnostics, Inc.</u>, 440 F. Supp. 2d 465, 469 (M.D.N.C. 2006) (quoting <u>Daubert</u>, 509 U.S. at 590, 597)).

Defendants do not make a formal <u>Daubert</u> argument regarding Plaintiff's expert, Mr. Rogers, and this court does not believe an exhaustive <u>Daubert</u> analysis is necessary here. Defendants claim Mr. Rogers' estimation of the "lump-sum up front payment . . . based on anticipated future sales" is inaccurate, arguing his comparator for anticipated sales was inappropriate. (Defs.' Reply (Doc. 167) at 16-17.) Though Defendants provide their own analysis critiquing Mr. Rogers' approach, they do not provide a countervailing expert to discount his methodology. Defendants also provide no contrary evidence of differing sales projections. (<u>Id.</u> at 17.) Mr. Rogers' report relies on, as Plaintiff points out, "actual sales data," and provides substantial explanation of his methods. In terms of their challenge to his methodology, Defendants appear to be challenging the use of certain values based on the license with Leggett & Platt. (Defs.' Br. (Doc. 143) at 28-29.) This objection is to the particular values Mr. Rogers used in his calculations, rather than the actual methodology employed – and

- 29 -

assessing "the values [the expert] chose to assign to certain variables" is a matter of weight and credibility, not admissibility. Bresler, 855 F.3d at 195. Mr. Rogers' testimony will not be excluded on the basis of this summary judgment motion.

### 2. Pre-Action Notice

Defendants also argue that this court should limit the damages available against them due to a lack of notice regarding potential infringement prior to the initiation of this action. See Limelight Networks, Inc. v. XO Commc'ns, LLC, 241 F. Supp. 3d 599, 608 (E.D. Va. 2017) ("To seek damages for patent infringement occurring before the initiation of a lawsuit, a patentee must have placed the allegedly infringing party on notice about the patent's existence."). Notice can be provided in two separate ways: "[a] patentee can place others on notice either constructively, by marking its patented articles with a patent number, or actually, by specifically communicating the existence of the patent." Id.

Whether notice of potential infringement has been properly provided under 35 U.S.C. § 287(a) is typically a matter for the jury – however, Defendants request summary judgment declaring notice was not provided prior to the suit. Since "compliance with the marking statute is a question of fact," in order to

- 30 -

receive summary judgment, Defendants need to demonstrate that "no reasonable jury could find that the patentee either has or has not provided . . . notice to the 'particular defendants by informing them of his patent and of their infringement of it.'" Banner Pharmacaps Inc. v. Perrigo Co., No. 1:04 CV 492, 2005 WL 2136927, at *7 (M.D.N.C. Aug. 1, 2005) (quoting Amsted Indus. Inc. v. Buckeye Steel Castings Co., 24 F.3d 178, 187 (Fed. Cir. 1994)).

### a. Marking

In lieu of actual notice, constructive notice can be provided via marking of products. 35 U.S.C. § 287 provides that:

> Patentees, and persons making, offering for sale, or selling within the United States any patented article for or under them, or importing any patented article into the United States, may give notice to the public that the same is patented . . . by fixing thereon the word "patent" . . . . In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice.

35 U.S.C. § 287(a).

Therefore, if a "patentee makes or sells a patented article and fails to mark in accordance with § 287, the patentee cannot collect damages until it either begins providing notice or sues the alleged infringer — the ultimate form of notice — and then

- 31 -

only for the period after notification or suit has occurred." Arctic Cat Inc. v. Bombardier Recreational Prods. Inc., 950 F.3d 860, 864 (Fed. Cir.), cert. dismissed, ____ U.S. ____, 141 S. Ct. 753 2020).

At no point do Defendants allege that Plaintiff failed to mark its products. In fact, Plaintiff maintains that all relevant products were marked by both Plaintiff and its licensee, (Pl.'s Resp. (Doc. 154) at 7), and no facts are presented to the contrary. Defendants instead allege Plaintiff has failed to present evidence demonstrating that "both that its licensee's products were continuously marked and that it made reasonable efforts to ensure its licensee's compliance with § 287(a)." (Defs.' Reply (Doc. 167) at 14.)

Defendants are correct that "[t]he burden of proving compliance with marking is and at all times remains on the patentee." Arctic Cat Inc. v. Bombardier Recreational Prods. Inc., 876 F.3d 1350, 1367 (Fed. Cir. 2017). However, "an alleged infringer who challenges the patentee's compliance with § 287 bears an initial burden of production to articulate the products it believes are unmarked 'patented articles' subject to § 287." Id. at 1368. In other words, before a plaintiff bears the burden to present evidence of marking, the defendants "shoulder[] only a burden of production to identify unmarked products that [they]

- 32 -

allege[] should have been marked." Id. at 1369 (emphasis added).
Though this bar is low, at no point do Defendants meet it: they
fail to actually allege that any products were unmarked. The
purpose of this rule is to prevent "gamesmanship" - which
appears to be Defendants' strategy by carefully avoiding the
allegation that any relevant products were, in fact, unmarked.
Id. at 1368. The court will not prohibit pre-action damages on
this ground at summary judgment, as Plaintiff maintains all
relevant products are marked and Defendants have not properly
challenged Plaintiff's compliance with § 287.

### b. __Actual Notice__

Defendants also seek summary judgment preventing pre-action
damages on the basis that Plaintiff "is not entitled to any
damages for sales of the accused products prior to the date
Plaintiff first provided written notice of its infringement
allegations." (Doc. 142.) Plaintiff argues that Defendants were
on notice because of Man Wah I, which involved similar
infringement allegations regarding the same patents. Plaintiff
argues that Man Wah I served to put Defendants on notice about
potential infringement for the products at issue in the present
case, in addition to the specific products covered in that
action. Indeed, "[i]f a patentee's initial notice is
sufficiently specific to accuse one product of infringement,

- 33 -

'ensuing discovery of other models and related products may bring those products within the scope of the notice.'" K-TEC, Inc. v. Vita-Mix Corp., 696 F.3d 1364, 1379 (Fed. Cir. 2012) (quoting Funai Elec. Co. v. Daewoo Elecs. Corp., 616 F. 3d 1357, 1373 (Fed. Cir. 2010); see also Iron Oak Techs., LLC v. Fujitsu Am., Inc., No. 3:16-cv-3319-M, 2018 WL 6593709, at *3 (N.D. Tex. Dec. 14, 2018) ("[O]nce a patentee provides notice of infringement with respect to one product, other models and related products may be found to be within the scope of the notice.").

The parties here disagree whether the initial action dealt with infringement that was sufficiently similar to the currently-alleged infringement such that notice was provided at the time of that case. The court's role here is the same as that on the question of claim preclusion similarity to Man Wah I. See discussion infra III.A.2.c. Given the factual dispute on this issue, and the high standard of summary judgment, this court is not in a position to rule that no reasonable jury could find adequate notice existed: this question comes down to the level of similarity of the products, which is ultimately an issue of fact. See MLC Intell. Prop., LLC v. Micron Tech., Inc., Case No. 19-cv-03345-EMC, 2019 WL 4963253, at *10 (N.D. Cal. Oct. 8, 2019) ("Nevertheless, at this early juncture in the litigation,

- 34 -

the Court cannot [come to a conclusion] as a matter of law . . . . [W]hether the [new] products are sufficiently similar for notice purposes is a question of fact for the jury to decide."); Novo Nordisk A/S v. Becton Dickinson & Co., 96 F. Supp. 2d 309, 320 (S.D.N.Y. 2000) ("Even where the notice given went to a merely related product class, such notice may be sufficient and the question of adequate notice must go to the jury.").

D. **Reasonableness of Royalties**

Defendants next allege that Plaintiff "cannot meet its burden of providing a reasonable royalty because Mr. Rogers's reasonable royalty analysis is unreliable and based on 'mere speculation or guess.'" (Defs.' Br. (Doc. 143) at 29.) First and foremost, as with many of the issues raised in these summary judgment motions, the credibility of expert testimony is fundamentally a question for the factfinder. The Federal Circuit has made clear that "[t]he degree of comparability [between two] license agreements as well as any failure on the part of [the] expert to control for certain variables are factual issues best addressed by cross examination and not by exclusion." ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc., 694 F.3d 1312, 1333 (Fed. Cir. 2012). See also i4i Ltd. P'ship v. Microsoft Corp., 598 F.3d 831, 856 (Fed. Cir. 2010)

- 35 -

("[Q]uestions about what facts are most relevant or reliable to calculating a reasonable royalty are for the jury.").

Moreover, Mr. Rogers' opinion, regardless of its credibility, does not appear to be based on mere "guess" as Defendants argue – he provides substantial analysis explaining his calculations, including an adjustment for non-exclusivity that affects the upfront payment. (Doc. 144-20 at 53.) The starting point of Mr. Rogers' analysis is the license with Leggett & Platt, which Defendants contest is an inappropriate comparator. (Defs.' Br. (Doc. 143) at 29.) Certainly, "[w]hen relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice." LaserDynamics, Inc. v. Quanta Computer, Inc., 694 F.3d 51, 79 (Fed. Cir. 2012). However, Mr. Rogers attests that he "searched the publicly available, fee-based, RoyaltySource® database in an effort to identify agreements relating to technology most similar to the Patents-in-Suit" and ultimately concluded that Leggett & Platt was the best comparator, in spite of its larger size, because "Defendants and Leggett & Platt are similar types of companies . . . and compete against each other in domestic and international markets." (Doc. 144-20 at 17-18.) It was also Mr. Rogers' expert opinion that "the Leggett & Platt License Agreement establishes

- 36 -

Ultra-Mek's desired licensing format that follow-on licensees, if any, would be pressed to accept." (Id. at 27.) Plaintiff notes that Defendants have failed to provide any expert testimony to counter Mr. Rogers' approach to assessing what royalties and upfront payment may be appropriate. (Pl.'s Resp. (Doc. 154) at 30.) Of course, the lack of an expert alone does not disqualify Defendants' argument. See, e.g., ResQNet.com, Inc. v. Lansa, Inc., 594 F.3d 860, 872 (Fed. Cir. 2010) ("This court should not sustain a royalty award based on inapposite licenses simply because [the defendant] did not proffer an expert to rebut [the other party's expert]."). However, the analysis provided by Mr. Rogers clearly goes beyond a "loose . . . comparability" to Leggett & Platt. LaserDynamics, Inc., 694 F.3d at 79. The license with Leggett & Platt, according to Mr. Rogers, bears substantial similarities to a theoretical license with Defendants – the companies are direct competitors, and the greater market size of Leggett & Platt was noted and allegedly taken into account by Mr. Rogers' report. Beyond the basic similarity presented here, further interrogation of the similarity of the licenses is best left to the factfinder.

E.    **Liability of Man Wah (USA)**

Finally, Defendants seek summary judgment dismissing Man Wah (USA) from the case "as there is no evidence that Man Wah

- 37 -

(USA) made, used, offered for sale, or sold any of the accused products." (Doc. 142.) Plaintiff's Complaint, (Am. Compl (Doc. 31)), alleges that "Man Wah Holdings, RMT, Man Wah (USA), and other companies are effectively operating as a single entity known as the 'Man Wah Group.'" (Id. ¶ 11.)

Regarding Counts I and II, the infringement counts, Plaintiff's Final Disclosure of Asserted Claims and Infringement Contentions includes the allegation that certain Defendants, while they may not have directly sold the Accused Products, still contributed to that infringement. (Doc. 136-18 at 3.) Plaintiff argues that Defendants were either selling the products themselves or "inducing or contributing others to manufacture, use, sell, and/or offer for sale in the United States and/or importing into the United States" the Accused Products. (Id. at 4.) In this vein, Plaintiff has amply alleged the overlapping business structure of Man Wah (USA) and the other Man Wah entities. Plaintiff also alleges that Man Wah (USA) "arranges" the sale of furniture for other Man Wah corporations, though further evidence of that has not been placed on the record in this case. (Pl.'s Resp. (Doc. 154) at 32.) A reasonable jury could find evidence that Man Wah (USA) indirectly infringed the patents at issue by, at the very least,

contributing to others offering the products for sale in the United States.

Counts III and IV, which deal with the alleged breach of the Settlement Agreement, allege that Man Wah (USA) "promised in the March 2017 settlement agreement that [it] and none of [its] affiliates" would infringe again, yet Man Wah Holdings and affiliates in fact "carried out such actions" as alleged in this complaint. (Am. Compl. (Doc. 31) ¶ 91.) Plaintiff also argues that Man Wah (USA) participated directly in "substantive business functions" and "decision-making" for Man Wah Holdings due to its "overlapping ownership and business functions." (Pl.'s Resp. (Doc. 154) at 32.) The record demonstrates that the CEO of Man Wah (USA), William Guy Ray ("Mr. Ray"), had full authority to settle on behalf of the entire Man Wah organization, which included all Defendants except UFI. (Doc. 107 at 3, 5.) Moreover, as the CEO of Man Wah (USA), Mr. Ray has openly stated he is "actively involved in" everything from "developing global strategies" to "decisions about new products." (Doc. 108 at 1-2.) Mr. Ray also indicates that these decisions are made "[f]or the entire Man Wah organization worldwide." (Id. at 1.) Summary judgment is not appropriate here, as a reasonable jury could disagree with Defendants that "Man Wah (USA) was not involved in the sales of the Accused

- 39 -

Products", (Defs.' Br. (Doc. 143) at 31), due to its overlapping business functions with Man Wah Holdings, as well as the extensive control its CEO possessed over the products released by the broader Man Wah organization.

IV.  **CONCLUSION**

For the reasons set forth herein,

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment, (Doc. 142), is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment, (Doc. 134), is **DENIED**.

This the 30th day of March, 2021.

_____
                United States District Judge

- 40 -